**MISSISSIPPI POWER & LIGHT CO. & Mississippi Public Service Commission, Plaintiffs-Appellees,**

v.

**UNITED GAS PIPE LINE CO., Defendant-Appellant.**

No. 84–4220.

United States Court of Appeals, Fifth Circuit.

May 17, 1985.

Garwood, Circuit Judge, filed dissenting opinion.

tween October and December 1983, the district court granted the preliminary injunction, entering its order on April 2, 1984. The order enjoined United from continuing to charge MP&L monthly rates which included the costs of certain gas purchased by United and certain transportation charges incurred by United. We affirm.

John R. Hutcherson, Brunini, Grantham, Grower & Hewes, Holmes S. Adams, R. David Kaufman, John E. Wade, Jr., Jackson, Miss., W. DeVier Pierson, Peter J. Levin, Washington, D.C., Larry J. Gunn, Houston, Tex., for defendant-appellant.

Joseph P. Wise, Wise, Carter, Child & Caraway, Thomas G. Lilly, David W. Clark, Jerry L. Patton, Benett Smith, Ms Public Service Comm., Jackson, Miss., Clayton L. Orn, Houston, Tex., for plaintiffs-appellees.

Before BROWN, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This diversity case was brought by Mississippi Power & Light Co. ("MP&L") and by plaintiff-intervenor, Mississippi Public Service Commission (the "Commission") against gas supplier United Gas Pipeline Company ("United") for breach of contract. The complaint charges United with violating the pricing provisions of a contract between MP&L and United dated December 8, 1967, and amended in 1969. MP&L sought to recover money damages in excess of thirty-one million dollars for alleged overcharges under the contract, and preliminary and permanent injunctive relief to prohibit future overcharges. MP&L alleged that future overcharges, if continued, would range from 1 to 2 million dollars per month, or up to 120 million dollars during the remaining life of the pricing provisions of the contract through December 31, 1987. After a total of six days of hearings be-

I.

On December 8, 1967, United and MP&L entered into a contract under which United agreed to sell and deliver, and MP&L agreed to purchase and receive, large volumes of natural gas. Article XIV of the contract set out various base rates MP&L would pay for different blocks of gas purchased each month. Such rates were to be adjusted up or down based on the "weighted average purchase price" per 1,000 cubic feet (mcf) of gas which United paid monthly for gas purchased in the Jackson (Mississippi) Area and in United's five other "areas" in Louisiana and Texas described in the contract. On April 29, 1969, MP&L and United executed an amendment to the contract. The amendment provided that the price of gas sold to MP&L would be based on an average price United paid for the gas in only *two* areas—the "South Louisiana Area" and the "Jackson Area,"—instead of in all the "areas" in which United was purchasing gas.

The amendment specified that the price of gas sold by United to MP&L would be based upon United's "weighted average purchase price of gas for the preceding billing month in the Jackson Area." The "weighted average purchase price of gas in the Jackson Area", would be derived by:

(1) adding together all the volumes of gas which Seller purchased in the Jackson area and transferred into the area during the preceding billing month;

(2) adding together the cost payable by Seller for the gas it purchased in the area and the cost assignable to the gas transferred into the area during the preceding billing month; and

(3) dividing the total of said costs payable by the total of said volumes purchased in and transferred into the area. The resulting quotient shall be the weighted average purchase price of gas in the area.

The amendment specified how "cost of gas" was to be assessed. As for gas *purchased* by Seller in the Jackson Area, the amendment provided:

(a) [t]he cost of gas purchased by Seller shall be the amount payable by Seller to the producer, pipeline or other seller; except that the cost of gas purchased on the seaward side of the shorelines of Florida, Alabama, Mississippi, Louisiana, and Texas ... shall be the amount payable to the producer, pipeline or other seller thereof, plus the amount, if any, by Seller to others for delivery of the gas onshore....

Thus, for gas purchased in the Jackson Area and obtained from the Gulf of Mexico, United could include both the purchase price *and* the delivery cost for bringing that gas to shore. No provision was made, however, for any transportation or delivery charges for gas purchased in the Jackson Area that was obtained anywhere other than from the Gulf of Mexico.

Next, the amendment provided that the "cost assignable to gas *transferred* into the Jackson Area," was to be the average price paid by United for gas which it *purchased* in only *one specific area*, the "South Louisiana Area." Additionally, the cost of delivery onshore to the South Louisiana Area would be included in the weighted average for gas obtained in the Gulf of Mexico:

(c) Cost assignable to gas transferred into the Jackson Area shall be the result obtained by multiplying the weighted average price paid by Seller for gas purchased in its South Louisiana Area ..., and in the Gulf of Mexico for delivery

onshore in the South Louisiana Area, by the volume of gas transferred into the Jackson Area.

In summary, the amendment based the price of gas to MP&L on the purchase price paid by United for gas which it purchased only in the "South Louisiana Area" and its "Jackson Area". The only exception to this pricing system was the allowance of costs for delivery for gas purchased by United originating in the Gulf of Mexico—namely, the cost of getting the Gulf gas onshore.

Except for the Gulf of Mexico gas, United purchased all of its gas from these two "areas" until the mid-1970's. At that time, United began to purchase from other areas and began to include such purchases in rates billed to MP&L. There is no evidence that United notified MP&L of its intent to include in the price of gas billed to MP&L the cost for gas purchased outside the areas specified in the contract.

In 1978, United entered into an agreement to purchase 450,000 mcf of Canadian gas per day from Northwest Alaskan Pipeline Company. The gas was purchased at the Canadian border and transported to Iowa by Northern Border Pipeline Company. It was there delivered to Northern Natural Gas Pipeline Company.[1] Pursuant to an exchange agreement with Northern Natural, United was to exchange that gas in Iowa for equivalent volumes of gas that Northern Natural would deliver to points designated by United in Louisiana, Mississippi, and Texas. Canadian gas began to flow through the Northern Border Pipeline in September 1982. It was the most expensive gas in United's system.[2] Rates charged to MP&L began to include the cost of the Canadian gas as well as the transportation charges incurred by United in delivering the Canadian gas to Northern Natural.

---

**1.** United owns a 12¼ percent equity interest in Northern Border Pipeline Company and is obligated to pay approximately 40 percent of the cost involved in the operation of the pipe line.

**2.** For example, in May 1983 the transportation costs associated with the Canadian gas was $5.92 per mcf compared to .55 per mcf for transporting gas from the Gulf of Mexico to the South Louisiana Area.

Of particular importance is the fact that ·in February 1979, shortly after United contracted to purchase Canadian gas from Northwest Alaskan Pipeline Company, United sought to amend its contract with MP&L so that the rates billed to MP&L would be calculated on a system-wide basis rather than on the limited geographic basis provided in the 1969 amendment. MP&L did not agree to the proposed amendment. In the summer of 1982, when MP&L learned of United's Canadian Gas agreement, MP&L conducted an audit of United's books pursuant to a provision in the agreement. MP&L conducted the audit primarily to ascertain whether United was including the cost of the Canadian gas in United's calculation of MP&L rates. The audit revealed that United had included not only the cost of Canadian gas in its rates, but also the cost of gas purchased in several other states outside of the area specified in the amendment agreement.[3]

MP&L auditors projected overbillings by United to MP&L of $6,583,822 for the period of September 1983 through December 1983. The auditors further projected an average annual overbilling of $21,145,205 for the years January 1, 1984 through December 31, 1987, when the current pricing provision expires. Assuming MP&L purchased only the minimum amount of gas required under the contract, the projected overbilling for the four year period, according to MP&L would be $84,576,820.

The district court enjoined United from including in their calculation of rates billable to MP&L:

(a) the cost of gas and associated transportation charges for Canadian gas and other purchases made outside of the Jackson Area, the South Louisiana Area or the Gulf of Mexico for delivery onshore in the South Louisiana Area;

(b) the cost of gas and associated transportation charges for gas purchased by United in the Gulf of Mexico and delivered onshore outside of the South Louisiana Area; and

(c) transportation charges incurred by United for transporting gas from one point on land to another point on land.

United appeals from the preliminary injunction. 28 U.S.C. § 1292(a)(1). In this appeal we are not concerned with refunds for past overcharges. All that is before us is an injunction against future violations of the pricing provisions in the contract.

## II.

The criteria for determining whether a preliminary injunction will be granted are set out in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974). *Callaway* established that the following requirements must be shown before a party will be entitled to preliminary injunctive relief:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Id.* at 572. The decision to grant or deny a preliminary injunction is discretionary with the district court. The standard we must apply in reviewing a grant of preliminary injunction, therefore, is whether the district court's decision constitutes an abuse of discretion. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984); *City of Meridian, Miss. v. Algernon Blair, Inc.,* 721 F.2d 525, 527 (5th Cir.1983). A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four *Callaway* prerequisites. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *State*

---

**3.** During MP&L's audit of United, United asserted its six years statute of limitations under Mississippi law and refused to provide auditors access to any of United's records prior to September 1976.

*of Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir.1975); *Callaway,* 489 F.2d at 576. We find that the district court was correct in holding that the Mississippi Power & Light satisfied its burden of meeting all four prerequisites to the preliminary injunction. We affirm.

*Likelihood of Success.*

We first consider the court's finding of a substantial likelihood that MP&L will prevail on the merits of this case. To evaluate the plaintiff's likelihood of success we determine what is the proper standard to be applied in evaluating plaintiff's claims, and then we apply that standard to the facts presented in the record. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 334 (5th Cir.1981). This is a diversity case and the parties do not dispute that Mississippi law applies. *See FMC Finance Corp. v. Reed,* 592 F.2d 238, 241 (5th Cir.1979).

■■■ Under Mississippi law, words of a contract are to be given their ordinary meaning. *Owen v. Gerity,* 422 So.2d 284, 288 (Miss.1982); *Continental Casualty Company v. Hester,* 360 So.2d 695, 696 (Miss.1978). When a written instrument is clear, definite, explicit and free from ambiguity, a court in construing it will look solely to the language used in the instrument itself. *Pfisterer v. Noble,* 320 So.2d 383, 384 (Miss.1975). If, however, a careful reading of the instrument reveals it to be less than clear and free from ambiguity, the court is obligated to pursue the intent of the parties which must be determined by resort to extrinsic aid. *Barnett v. Getty Oil Company,* 266 So.2d 581, 586 (Miss. 1972). Applying these standards, the district court concluded that "[w]hile the pricing provisions of the Agreement are complex, at the present time it appears to the Court that there is a limitation on the charges which may be included in the computation of the price of gas to MP&L".

The district court first found that the contract did not contemplate the inclusion of the price of the Canadian gas, or other gas purchased outside the areas specified in the contract, in the price calculation to be used in billing MP&L. Although the contract does refer specifically to pricing in relation to the Jackson and South Louisiana Areas, there is no mention of any costs associated with any other area, including the costs of the exchange gas which began to appear in MP&L's billing in 1982 shortly after United began receiving the gas through its system from the Canadian border. MP&L never actually received any of the Canadian gas in the Jackson Area, yet the cost of the Canadian gas was reflected in MP&L's billing.

United did not inform MP&L that it was including the exchange costs in MP&L's billing structure, and it was not until MP&L conducted its own audit of United that the inclusion was discovered. Furthermore, United's witnesses were unable to identify any other United contracts where the price of exchange gas was included in a customer's billing, even though the witnesses were aware that other exchange agreements existed. Based on all of this evidence, the district court concluded that it was not the intention of United and MP&L to include the cost of exchange gas in the contract.

The district court also enjoined United from charging MP&L transportation costs for gas delivered from the Gulf of Mexico to locations other than the South Louisiana Area. The court concluded that the clear and unambiguous meaning of the words "onshore in the South Louisiana Area" meant that transportation charges should be included for gas obtained in the Gulf of Mexico and delivered onshore in that specific area. The court found United's argument that "onshore to South Louisiana" meant "onshore to anywhere in United's main Pipeline system" to be a gross distortion of the clear wording of the contract.

The billing system which United uses further supports the conclusion that the costs of neither the Canadian exchange gas nor the transportation costs for delivery outside the South Louisiana Area were to be included in MP&L's billing under the contract. The majority of United's indus-

trial customers are billed for gas using a "system-wide" computation. This means that the cost of gas is calculated based on all gas purchased throughout United's system. Under the system-wide approach, no differentiation by location of the gas purchases is made.

By United's own admission, the contract with MP&L is not based on a system-wide computation for determining the price of gas. Rather, the contract provides that the price of gas will be based on an area-specific computation. This means that regardless of where the gas ultimately delivered to MP&L is purchased, the price charged will be based on the areas specified in the contract. Prior to 1982, MP&L's billing reflected computations based on the area-specified calculation. Shortly before United concluded its Canadian deal with Alaskan, United approached MP&L to discuss the possibility of amending the contract to reflect a system-wide computation as opposed to the area-specific computation. MP&L declined to amend the contract. Shortly thereafter and without MP&L's knowledge the cost of the Canadian exchange was included in MP&L's price computation.

United claims that its inclusion of those costs in its computation was justified under the terms of the contract and that the district court, by granting the preliminary injunction against United, merely accepted MP&L's interpretation of the contract over its own. In light of the evidence before the district court, however, we agree that under the language of the contract and evidence relating to the intent of the parties, there is a substantial likelihood that MP&L will prevail. After MP&L refused to alter the terms of its contract with United, United took it upon itself to include the additional exchange and transportation costs anyway. Once this action was questioned by MP&L, United attempted to justify its position with an unconvincing interpretation of the existing terms of the contract.

We stress that the district court's conclusion as to the likelihood of success does not represent a final determination on the merits. It is true that the pricing terms of the contract are complex, and protracted litigation over the interpretation of the contract terms may well ensue. In the meantime, we find that the district court properly concluded that the probability of success weighed substantially in MP&L's favor.

*Irreparable Injury and the Public Interest.*

Having determined that there is a substantial likelihood that MP&L will prevail on the merits in this dispute, the district court next found a substantial threat that irreparable injury would result if the preliminary injunction did not issue. The court also found that granting the injunction was in the public interest, stating that "the dominant presence of the public interest in this case convinces the Court that a preliminary injunction is warranted". We believe that the district court has correctly identified the public interest as the central issue in this case. The irreparable harm asserted is the adverse impact that the overcharges would have on the public. Thus, the irreparable harm and the public interest inquiries are intertwined, and we consider them jointly. *See Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 568 (5th Cir.1981).

As all parties to this dispute acknowledge, pecuniary loss to MP&L is not at issue in this appeal. MP&L concedes that monetary damages would be an adequate remedy to it at the end of a trial on the merits. MP&L passes all fuel charges on to its customers, so it is the public that is ultimately affected by any overcharges. The Mississippi Public Service Commission intervened in this action to protect consumers from overcharges. Indeed, the public interest is substantial in this case in that fuel charges comprise between fifty and sixty percent of the total cost charged to the consumers.

On the questions of irreparable harm and public interest, the district court granted injunctive relief based primarily on the tes-

timony of Mr. Marvin Havens, Chairman of the Mississippi Public Service Commission. As the Commissioner pointed out, if the injunction were denied and MP&L ultimately prevailed on the merits of this case, the consumers of MP&L would have to be compensated by a refund system for the overcharges. The Commissioner testified that previous experience with refunds to the public shows that they create serious administrative problems and ultimately prove to be an inadequate remedy. Citing as an example a 1980 rate case where MP&L was ordered to make refunds to its customers, he explained that some 20,000 refund checks marked "undeliverable" were eventually returned to MP&L, representing approximately 1 million dollars in refunds lost to their intended recipients. In addition, the cost of processing each check was approximately five dollars, which substantially reduced the pool of funds available for consumer refund. Based on this testimony, the district court concluded that a refund would be an inadequate remedy.

The case of *Federal Power Commission v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962), supports the conclusion that refunds in a utility rate dispute are not adequate to compensate the consumers who have borne the burden of overcharges pending the resolution of litigation. In that case, the Court was called upon to review an interim order of the Federal Power Commission to reduce rates pending final determination of proceedings with respect to the allocation of rates by a natural gas company. The company argued that ultimately it could be decided that a higher rate was reasonable, so the interim order might result in irretrievable loss to the company. The Court,

however, upheld the order. It said that use of such an order was in keeping with the purpose of the Natural Gas Act, 15 U.S.C. § 717, "to protect consumers against exploitation at the hands of natural gas companies" and "to underwrite just and reasonable rates to the consumers of natural gas." *Tennessee Gas Transmission*, 371 U.S. at 154, 83 S.Ct. at 216 (citations omitted). The Supreme Court projected that had the gas company been allowed to continue its collection of illegal rates:

> the exaction would have been subject to refund, but experience has shown this to be somewhat illusory in view of the trickling down process necessary to be followed, the incidental cost of which is often borne by the consumer, and in view of the transient nature of our society which often prevents refunds from reaching those to whom they are due.

*Id.* (footnote omitted).[4] Here the district court considered testimony that indicated the likelihood of similar problems if a refund were ultimately required. The illusory nature of the remedy of a refund under the circumstances of this case supports the conclusion that irreparable harm would result if overcharges continued. Many of the consumers injured would never be compensated adequately.[5]

Two other considerations have been raised which underscore the importance and magnitude of the public interest at stake. First, the demographics of the area served by MP&L are of particular concern in relation to the threatened harm to the public. Mississippi has the lowest per capita income of the fifty states. Forty-four of the forty-five counties served by MP&L had an average per capita income of only $6,723 in 1981, as compared to the low

---

**4.** *City of Chicago v. Federal Power Commission*, 385 F.2d 629 (D.C.Cir.1967), also concluded that refunds were not an adequate substitute for immediate rate reduction, citing *Tennessee Gas Transmission. Id.* at 644. *City of Chicago* dealt with an order by the FPC to reduce rates based on tax provisions that allowed for a flow through of more liberalized depreciation to consumers of natural gas.

**5.** This argument, of course, cuts both ways in that if United ultimately prevailed and back charges were passed on to MP&L consumers, many new consumers would in effect be forced to subsidize past consumers for their previous gas consumption at lower rates. But because we have already determined that the likelihood of success lies with MP&L, we conclude that harm would more likely to befall current consumers if the injunction were not granted.

state average of $7,409. Statewide, approximately twenty-two percent of the families in Mississippi lived below the poverty level in 1979.[6] A refund of overcharges sometime in the future could never adequately compensate families living at or close to the poverty line for hardships they would endure as a result of overcharges they would have to pay at present and during the course of litigation. This is especially true in light of evidence presented to the court that low income bracket families frequently consume large amounts of fuel.

Second, in our consideration of the public interest at stake we note that the Mississippi Legislature recently enacted the Utility Reform Act of 1983[7] which was a substantial remodeling of the previous Utility Act of 1956. In its declaration of policy, the Act announces the strong public interest involved in the determination and regulation of utility rates. Miss.Code Ann. § 77–3–2 (Supp.1984). The Chairman of the Commission, who has testified concerning the Act on numerous occasions, stated that one of the primary obligations of the new legislation was to prevent charges from being passed on to any consumers before some judicial or administrative determination on the lawfulness of the charges. Compliance with the obligation could be met, for example, in a Commission hearing on the fairness and lawfulness of the charges.

But the Commission is without jurisdiction to regulate the contract between MP&L and United, and may only regulate the rates ultimately charged by MP&L to its customers. Thus, in a sense, the district court was fulfilling a role analogous to that of an administrative rate regulation body in deciding whether to issue the preliminary injunction. In this dispute, the Commission urged that United's insistence on billing

certain charges conflicted with the legislative intent of the Act by seeking the continuation of charges before the lawfulness of the charges had been determined. The Commission urged the district court to consider the Commission's legislative interest and regulatory role in protecting the public.

There is an issue of the propriety of considering harm to the public when the injunctive relief sought concerns a private contract. In this respect, we first note that although the consumers of MP&L are not parties to this suit, the Mississippi Public Service Commission has intervened on their behalf. Indeed, it would be anomalous to conclude that the Commission's intervention was proper, but that its interests, i.e., the interests of the consumers of MP&L, cannot be considered because the Commission was not a party to the disputed contract. More significant is a reminder that the standard for determining the propriety of granting a preliminary injunction is the same regardless of the nature of the dispute. The prerequisites set out in *Callaway* remain the proper standard for granting a preliminary injunction in all instances where a statute is not otherwise controlling. This means that even in a private contract dispute we are required by *Callaway* to take into account the vital public interest which may be in jeopardy. The requirement that we consider the public interest would be meaningless if we were to identify potential injury to the public but were to conclude that in the context of a contract dispute we were constrained to consider only the immediate interests of the parties to the contract.[8]

In recent years, federal courts have given increasing attention to the importance to the public interest of prelimi-

6. The data considered is based on publications of the United States Department of Commerce—Bureau of Economic Analysis, and was introduced by MP&L and the Commission at the injunction hearing.

7. Miss.Code Ann. § 77–1–1—77–1–49 (Supp. 1984), 1982 Miss.Laws 389, § 1.

8. At oral argument, United declined to state that harm to the public was an inappropriate consideration in a private contract case. Instead, United conceded the vital public interest involved, but argued that there was no irreparable injury to the public.

nary injunctive relief. In the opinion of one commentator, such a shift in emphasis is perhaps a demonstration of judicial concern about the impact of legal decisions on society as a whole as opposed to the more limited interests of private litigants. *See* Leubsdorf, "The Standard for Preliminary Injunctions", 91 Harv.L.Rev. 525, 549 (1978); *see also* 7 J. Moore, Moore's Federal Practice, § 65.04[1] (2d ed. 1984). We conclude that the public interest involved in this dispute compels us to look beyond the immediate interests of the named litigants and to consider the situation of the consumers upon whose behalf the Mississippi Public Service Commission has intervened. The vital public interest involved in protecting the consumers of MP&L against the harmful effect of overcharges establishes the requisite apprehension of irreparable injury and warranted the granting of preliminary injunctive relief.

*Balance of Harm.*

The final task under *Callaway* is to balance the harm that would be suffered by the public if the preliminary injunction were denied against the possible harm that would result to United if the injunction were granted. United contends that if it is to be enjoined from collecting the alleged overcharges, its revenues will be substantially reduced, seriously affecting its borrowing capacity. United estimates that enjoining it from collecting approximately 21.1 million in revenues from MP&L during 1984 could result in a loss to United of 60 million dollars in available credit. This loss of revenues and any concomitant loss in borrowing capacity, it is urged,

could affect United's ability to settle the take-or-pay disputes that United is currently negotiating with several natural gas producers.[9] United estimates its take-or-pay exposure for 1984 at a possible one billion dollars. United fears that if its borrowing ability is diminished due to reduced revenues from MP&L, producers might lose confidence in United and begin taking their claims to court, seriously jeopardizing United's viability as a gas supplier.

United's potential exposure to liability, take-or-pay or otherwise, is not a new state of affairs. In past years, United has managed to preserve its viability in the face of substantial liability. United's annual report for 1982 indicates that revenues were nearly 3.5 billion in that year. In the same year, United listed on its consolidated "Statement of Income and Retaining Earnings" as an extraordinary expense item nearly 60.5 million in litigation costs.[10] Despite its liability exposure, United still had end of the year retained earnings of $216,369,000, and paid out 66 million dollars in dividends. A loss of any revenues would inevitably have some impact on operations, but the district court found that United's projection of harm did not depict a likely scenario given the healthy state of United in 1982 when the company was already facing considerable liability. The court thus concluded that the balance of harm tipped in favor of granting the injunction because the harm threatened to the public was perceived as being greater than any speculative harm that might be suffered by United. We find no reason to disturb this finding.[11]

**9.** Under United's take-or-pay gas supply contracts, United is required to purchase, or pay for and not take, volumes of gas in stated amounts. Payments made under these take-or-pay provisions for gas actually taken are generally subject to recoupment *to the extent possible* by takes of gas in future periods in accordance with the terms of existing contracts. Due to the current oversupply situation, United had to prorate its takes from many suppliers, and certain suppliers have billed United for amounts allegedly due under the take-or-pay provisions.

**10.** This "extraordinary item" represents the net adverse effect on income in a settlement agree-

ment. Claims in other suits were settled during the year 1982 with no significant adverse effect on income, and therefore, were not included as items on the Income Statement.

**11.** We add that any detrimental effect of which United complains resulting from a loss of revenues is, of course, only harmful if United ultimately prevails in this controversy. Thus, there is no way that harm can presently be determined because we do not yet know if United will ultimately be entitled to such revenues. However, since we have already determined that likelihood of success lies with MP&L, we

*Conclusion.*

█ The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. *Callaway*, 489 F.2d at 576. The district court found that this purpose would best be served by enjoining United from charging certain costs because of the substantial likelihood they were overcharges and because of the irreparable harm such overcharges would inflict upon consumers who purchased their fuel from MP&L. We conclude that there is ample evidence in the record to justify the district court's decision.

AFFIRMED.

GARWOOD, Circuit Judge, dissenting:

I respectfully dissent. In my view the temporary injunction is not supported by an adequate showing of irreparable injury, the recognized *sine qua non* of such relief in this character of case.

The underlying controversy, and the interim relief, relates solely to the *amount of money* to be charged by United Gas Pipe Line Company ("United") to Mississippi Power & Light Company ("MP&L") pursuant to the unregulated contract to which those two investor-owned concerns are the only contracting or beneficiary parties. The merits of the suit are to no extent based on any assertion that the

price charged by United is illegal or otherwise one that MP&L could not lawfully agree or have agreed to pay. Rather, the sole question on the merits is that posed by MP&L's assertion that it did not so agree and that United and it agreed to a specified lower price.[1] In short, this is a suit for breach of the pricing provisions of a private unregulated contract, and its disposition on the merits presents no questions of public or regulatory law. *See New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452 (5th Cir.) (en banc), *cert. denied sub nom. Morial v. United Gas Pipe Line Co.*, — U.S. ——, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). I do not dispute the power of an administrative agency to suspend rates it has preliminarily determined are excessive, rather than allowing them to go into effect and later utilizing a refund procedure. *See Federal Power Comm'n v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962).[2] But we are not enforcing a regulatory order or public statute here. Rather, the legislative bodies concerned have expressly exempted the prices in question from regulation and have left them to private sellers and purchasers. The Natural Gas Act does not regulate the price at which gas is sold in "direct" or not-for-resale sales, whether interstate or intrastate.[3] Mississippi initially elected not

are the more convinced that the balance of harm weighs in MP&L's favor.

1. I pretermit any discussion of the merits of this question.

2. As the Court said in *Tennessee Gas:*

"[T]here is 'no question' as to the Commission's authority to issue interim rate orders.
"....
."... Faced with the finding that the rate of return was excessive, the Commission acted properly within its statutory power in issuing the interim order of reduction and refund, since the purpose of the Act is 'to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges' [citation omitted]. To do otherwise would have permitted Tennessee Gas to collect the illegal rate for an additional 18 months ...." 83 S.Ct. at 214–16.

3. *See* 15 U.S.C. § 717(b); *Pennsylvania Gas Co. v. Public Serv. Comm'n*, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920); *Panhandle E. Pipe Line Co. v. Public Serv. Comm'n*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947); *Cities Serv. Gas Co. v. United States*, 500 F.2d 448, 205 Ct.Cl. 16 (1974). The Natural Gas Act *does* require that all furnishing of gas in interstate commerce must be pursuant to a Federal Energy Regulatory Commission ("FERC") certificate of public convenience and necessity and that no portion of such service may be abandoned without prior FERC approval. 15 U.S.C. §§ 717f(b) & (c). *See Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). However, there is no claim of abandonment or threatened abandonment here.

to regulate "direct" *inter*state gas sales,[4] such as the sales from United to MP&L. More recently, it apparently has also elected to deregulate *intra*state natural gas pipeline company sales to industrial or public utility purchasers.[5] What the district court has done here, with the sanction of the majority, is in essence to employ the federal judicial equity power incident to this diversity breach of private contract suit as if it were a vehicle to fill the public law-regulatory hiatus established by Congress and the Mississippi Legislature. In my view, this is not an appropriate judicial function, particularly not for the federal judiciary.

This, of course, is not to imply that preliminary injunctions have no place in contract actions. But the normal standards must be met. The majority recognizes our oft-repeated admonition "that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion," *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974), "as to all of the four prerequisites" for such relief, *id.* at 576, including "(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted." *Id.* at 572.[6] The indispensability of proof of "irreparable injury"

would seem to clearly appear from its listing as one of "the four prerequisites." And indeed we have frequently reiterated *Canal Authority*'s admonition that the requirement that the four prerequisites be established means "all of the four."[7] Moreover, it is evident that among the four prerequisites, one is central and preeminent, namely, the "irreparable harm" prerequisite. This is made clear from *Canal Authority:*

> "A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits. . . .
>
> " . . . The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits. . . . Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." 489 F.2d at 572–73.

Many other decisions by this Court are to like effect. *See, e.g., Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir.1975) ("[T]he central purpose of a preliminary injunction . . . is to prevent irreparable harm. It is the threat of harm that cannot be undone which authorizes exercise of this equitable

---

**4.** *See United Gas Pipe Line Co. v. Mississippi Pub. Serv. Comm'n*, 241 Miss. 762, 133 So.2d 521 (1961); *Texas Gas Transmission Corp. v. Mississippi Pub. Serv. Comm'n*, 241 Miss. 826, 133 So.2d 526 (1961).

**5.** *See* Laws 1977, ch. 455; *Miss.Code Ann.* § 77–11–301 *et seq.*

**6.** The other three prerequisites are:

> "(1) [A] substantial likelihood that plaintiff will prevail on the merits, (2) [above quoted], (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." 489 F.2d at 572.

This formulation has been repeated almost innumerable times by this Court. Relatively recent cases include *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir.1984), and *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721

F.2d 525, 527 (5th Cir.1983). That the moving party has the burden of proof on each of these "prerequisites" has likewise been frequently reiterated. *See, e.g., Apple Barrel Prods., Inc.*, 730 F.2d at 389; *Commonwealth Life Ins. Co. v. Neal*, 669 F.2d 300, 303 (5th Cir.1982).

**7.** *See, e.g., Apple Barrel Prods., Inc.*, 730 F.2d at 389 ("In order to obtain preliminary injunctive relief, the movant must carry the burden of persuasion on each of the elements of the four prong test."); *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 186 (5th Cir.1982) ("A preliminary injunction may not issue unless the movant carries the burden of persuasion as to all four prerequisites."); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981) ("In order to prevail plaintiff must carry the burden on all four elements."); *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 114 (5th Cir.), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980) ("The remedy should not be granted unless the movant carries the burden of persuasion concerning all four of these criteria.").

power to enjoin before the merits are fully determined."); *Lewis v. S.S. Baune,* 534 F.2d 1115, 1121 (5th Cir.1976) ("The finding prior to issuance, most essential to a preliminary injunction, is that the failure to grant it will result in irreparable injury ...."); *Van Arsdel v. Texas A & M University,* 628 F.2d 344, 346 (5th Cir.1980) ("A preliminary injunction is an extraordinary remedy which the district court should grant only when necessary to protect the plaintiff from irreparable injury ....").[8] These decisions echo the Supreme Court's admonition in *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974), "that '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies,' Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959) ...." That language was reiterated in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Making the same point, 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2948, states that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.* at 431.[9]

Consequently, although the grant or denial of a preliminary injunction is reviewed under an abuse of discretion standard, it is nevertheless settled that, with possible exceptions for certain statutory actions, there is no discretion to grant such relief absent an adequate showing of likely irreparable harm. Relief granted contrary to this requirement will be reversed on appeal. Our decisions clearly follow this path. *See Parks v. Dunlop, supra; Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir.1975); *Lewis v. S.S. Baune, supra; Van Arsdel v. Texas A & M University, supra.* Other Circuits are in accord.[10]

Finally, and crucially here, while in many contexts what constitutes irreparable injury may be difficult to determine, it is nevertheless settled that " '[a]n injury is "irreparable" only if it cannot be undone through monetary remedies' [citation omitted]." *City of Meridian, Miss. v. Algernon Blair, Inc.,* 721 F.2d 525, 529 (5th Cir.1983) (quoting *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981)). It necessarily follows that the hardship and inconvenience attendant on interim loss of monies which will be paid, with interest, on final judgment does not constitute irreparable harm. In *Sampson v. Murray,* the Court held that a mere temporary loss of income would fall "far

---

**8.** *See also Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F.2d 560, 568 (5th Cir.1981) ("[T]he essential question determining the propriety of a preliminary injunction" is "whether the injunction is necessary to preserve the court's ability to render a meaningful decision on the merits.").

**9.** *See also* 11 Wright & Miller, *supra,* § 2942 at 368–69 ("[T]he main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy.").

  Other scholars take a similar view. *See* Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.Rev. 525, 565 (1978) ("[T]he heart of the matter" is "the need to prevent irreparable injury to legal rights.").

  As the Sixth Circuit said in *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102–03 (6th Cir.1982):

  "Although these four factors [similar to those of *Canal Authority* ] guide the discre-

tion of the district court, they do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief.... Nevertheless, this court has never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief. Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued."

**10.** *See, e.g., In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1145–47 (3d Cir.1982); *Ciechon v. City of Chicago,* 634 F.2d 1055, 1057–58 (7th Cir.1980); *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201–02 (9th Cir.1980); *Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n,* 725 F.2d 564, 569–70 (10th Cir.1984).

short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." 94 S.Ct. at 953. The *Sampson* Court, in its discussion of the irreparable injury requirement, quoted with approval the following passage, *inter alia,* from *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958):

> " 'The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.' " 94 S.Ct. at 953 (emphasis in original).

Following *Sampson,* we have held that loss of salary representing forty-five percent of family income, which the district court found would probably lead to foreclosure of the mortgage on plaintiff's home, did not constitute irreparable injury, as the salary loss would be fully compensated by an award of back pay should plaintiff prevail on the merits. *Morgan v. Fletcher, supra.* We accordingly set aside the temporary injunction issued by the district court. *Id.* In *Van Arsdel v. Texas A & M University,* we made a similar holding, stating, "Since reinstatement after trial, coupled with back pay, would suffice to redress appellee's alleged wrong, we find that the preliminary injunction must be vacated." 628 F.2d at 346. *See also Parks v. Dunlop, supra; Lewis v. S.S. Baune, supra.*

Other Circuits clearly follow this rule. For example, in *Glasco v. Hills,* 558 F.2d 179 (3d Cir.1977), it was held that tenants of a large subsidized housing project were not entitled to a preliminary injunction against increased rents because "the claimed injury was financial, a loss of money, a loss capable of recoupment," and should the tenants eventually "prove victorious, the path would be clear for refunds of improper rent increases." *Id.* at 182 (footnote omitted). *Glasco* was reaffirmed in *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1145 (3d Cir.1982), where the Court also stated, "[W]e have never upheld an injunction where the claimed injury constituted a loss of money." *See also Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n,* 725 F.2d 564, 569–70 (10th Cir.1984) (neither growers' loss of revenue from sales of sugar beet crops nor manufacturer's inability to obtain adequate supply for operation of its plant constituted irreparable harm sufficient to justify preliminary injunction); *Ciechon v. City of Chicago,* 634 F.2d 1055, 1057 (7th Cir.1980) ("loss of wages, employee benefits, and opportunities for promotion" did not constitute irreparable injury sufficient to meet the requirements for a preliminary injunction) [11]; *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201–02 (9th Cir.1980) (lost revenue due to failure to acquire football team tenant not sufficiently irreparable to warrant preliminary injunction).[12]

**11.** And, in *American Hosp. Ass'n v. Harris,* 625 F.2d 1328, 1331 (7th Cir.1980), the Seventh Circuit approvingly cited this Court's opinion in *Morgan v. Fletcher, supra,* for the proposition that " '[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.' "

**12.** There are a few narrow exceptions to the rule that the possibility of an award of damages precludes a finding of irreparable harm sufficient to authorize a preliminary injunction. All are clearly inapplicable here. One is where a statute or regulation is thought to require the preliminary relief. *See United States v. Hayes Int'l Corp.,* 415 F.2d 1038, 1045 (5th Cir.1969). Another may apply where the rights at issue are noneconomic, particularly constitutional rights

such as those secured by the First Amendment. *See Henry v. First Nat. Bank of Clarksdale,* 595 F.2d 291, 304 (5th Cir.1979), *cert. denied sub nom. Claiborne Hardware Co. v. Henry,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). A similar exception exists where the rights are economic, but because of their nature or the circumstances of the case establishment of the dollar value of the loss is especially difficult or speculative. *State of Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir.1975). An exception has also been recognized where withholding relief "would have entailed the virtual disappearance of" the plaintiff "as a functional entity." *Henry,* 595 F.2d at 305. Finally, exception may be made where the defendant is unable to respond in damages; there was no sufficient evidence or finding on this exception, and the majority does not rely on it. *See generally*

The majority asserts that the irreparable injury is to MP&L's customers, who would have to pay more in the interim for electricity. Reference is made to the fact that Mississippi has the nation's lowest per capita income and that in forty-four of the forty-five counties served by MP&L the per capita income is somewhat below the statewide average. There was no evidence, however, that the disputed charges, which had been in effect for a year prior to the hearing below, had worked any irreparable hardship on any MP&L customers.[13] MP&L estimated United's future annual "overcharge" at approximately $21 million. Taking the figures from MP&L's own records introduced in evidence below, it appears that this claimed overcharge would amount to slightly less than four percent of MP&L's total 1982 revenues from the sale of electricity. Allocating the overcharge in the same proportions that MP&L's 1982 electric sales revenues are allocated, approximately $7,050,000 would be charged to residential customers, of whom there were 268,556 at the end of 1982, for an average annual charge of about $26.26 or $2.19 per month.[14] Again, this would amount to just less than four percent of the average residential bill. If it be assumed that temporarily decreasing home electric use by four percent, òr paying an additional $2.19 per month, amounts to irreparable harm, nevertheless there was plainly no necessity that MP&L pass these disputed charges through prior to final judgment.[15] If there is a difficulty with refunds—which for the most part could be minimized by credits on customers' bills—it is obviously with the residential customers, who comprised about eighty-six percent of the total as of the end of 1982. The $7,050,000 of the claimed annual overcharge attributable to these customers, amounting to approximately twenty percent of MP&L's net income, could be temporarily absorbed by MP&L and, if its suit has merit, collected by it from United with appropriate interest on final judgment. Moreover, the residential and commercial customers together

---

Restatement (Second) of Contracts §§ 359(1), 360 (1981).

**13.** Nor was there any evidence about the cost of living in Mississippi as compared to other parts of the nation, or whether domestic electricity costs represented a higher or lower portion of the typical family budget. We should not simply assume that there is one standard for preliminary injunctions in these forty-five Mississippi counties and another in, say, forty-five counties in Southern California.

**14.** In 1982, MP&L's total revenues from the sale of electricity were $546,421,000, of which $183,045,000, or approximately one third, was residential, and $128,099,000 was commercial. At the end of 1982, there were a total of 312,717 MP&L electricity customers, of whom 268,556 were residential and 38,651 were commercial. The balance of the customers were industrial, governmental and municipal, and other utilities. MP&L's 1982 net income was $35,120,000.

**15.** Commissioner Havens, Chairman of the Mississippi Public Service Commission ("the Commission"), testified that it was the intent of the Mississippi Legislature "that a charge will [not] flow [through] to a consumer before it is determined lawful or unlawful." Nevertheless, he also testified later in his direct examination that "I can't cite you that section, but I believe the statute dictates to the Public Service Commis-

sion ... that all gas, whether it be an overage or an underage, will be flowed through in a fuel adjustment clause to its rate payer." However, no such statute (nor any court decision or attorney general's opinion or similar authority) has been cited to us by the Commission or MP&L and we have been unable to find any. To the contrary, the Mississippi statutes clearly appear to authorize the Commission to "define specific costs which may be included" in fuel adjustment retail billing, *Miss.Code Ann.* § 77–3–45(e), and to *require* exclusion, *inter alia,* of any costs determined by the Commission to be "unjust or unreasonable." *See id.* at § 77–3–42. Nothing *requires* the utility *to include* disputed costs. Chairman Havens admitted as much during his cross-examination.

It seems plain that the Commission has the authority to require that these disputed costs *not* be passed through, at least pending resolution of the dispute, and, equally, that MP&L is not legally obliged to pass them through while they are disputed.

I also observe that the Mississippi statute specifically provides for the refund of excessive charges, with interest, by credit on the utility bill if the overcharged party is then a customer of the utility. § 77–3–42. The only evidence as to the turnover of customers was Chairman Havens' testimony, "You would probably experience from a 6 to 7 percent turnover, maybe, annually. That's purely a guesstimate."

amount to over ninety-eight percent of the total number of MP&L's electric customers, but account for only fifty-seven percent of its electricity revenues.[16] There is no suggestion of difficulty with refunds as to the relatively few remaining, obviously large institutional customers, nor any indication that MP&L would be in any sense irreparably harmed by the interim foregoing of the some $12 million of annual revenue representing the portion of the claimed annual overcharge attributable to residential and commercial customers. Indeed, there is no showing that MP&L would be irreparably harmed by postponement of collection of all the $21 million, amounting to about sixty percent of its 1982 *net* income, until final judgment. Certainly we are presented with nothing remotely approaching a need for preliminary relief to forestall any threatened "virtual disappearance" of MP&L "as a functional entity." *See Henry v. First Nat. Bank of Clarksdale,* 595 F.2d 291, 305 (5th Cir.1979), *cert. denied sub nom. Claiborne Hardware Co. v. Henry,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980).[17]

In these circumstances, reliance on the public interest to sustain the award of preliminary relief is surely misplaced. Moreover, such employment of the "public interest" factor misconceives its role in this kind of case. To begin with, at least absent some contrary statutory mandate, *see*

United States v. Hayes Int'l Corp., 415 F.2d 1038, 1045 (5th Cir.1969), prevention of irreparable harm is, of itself, an indispensable element for granting a preliminary injunction. The satisfaction of *another* necessary element—the public interest—is not sufficient. That necessarily follows from our above-referenced holdings that each and all of the four *Canal Authority* elements must be established. This is, of course, particularly true as to the prevention of irreparable harm element, for, as previously indicated, it is the ultimate touchstone for preliminary injunctive relief. *See, e.g., Rondeau v. Mosinee Paper Corp.,* 95 S.Ct. at 2079 ("[T]he fact that respondent is pursuing a cause of action which has been generally recognized to serve the public interest provides no basis for concluding that it is relieved of showing irreparable harm and other usual prerequisites for injunctive relief."); *Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n,* 725 F.2d at 570 (Absent adequate showing of irreparable injury to plaintiffs, a "finding of irreparable injury to the community" does not suffice to sustain a preliminary injunction.).[18] Further, the "public interest" prerequisite is "that granting the preliminary injunction will not disserve the public interest." *See supra* note 6. *See also, e.g., Morgan v. Fletcher,* 518 F.2d at 239; *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 114 (5th Cir.), *cert.*

---

**16.** Using the 1982 figures.

**17.** *See also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975) (Threatened "bankruptcy" is an injury which "meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless.").

**18.** *Cf.* Leubsdorf, *supra* note 9, at 543 n. 101 ("That a tentative weighing indicates the defendant's activities are socially harmful does not warrant preliminary relief if, for example, the harm can be compensated by damages."), & 549 ("An interlocutory decision about specific performance of a contract to make parts for a power plant should turn on the applicable contract law, not the plant's environmental impact.... Those whom the law excludes from protection at the final hearing have no greater claim to be taken into account earlier."). We

have held that consumers have no legally protectable interest in a contract price dispute between a utility and its fuel supplier where resolution of the dispute is wholly governed by private contract law and rights are not asserted under public law statutes or regulations. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., supra.* The grant of permissive intervention to the Commission does not change the applicable substantive law by which the instant controversy is to be resolved, which remains the applicable private contract law of Mississippi, as all parties recognize. The public "interest in the enforcement of contractual obligations" obviously is not the variety of public interest comprehended by the fourth *Canal Authority* prerequisite. *See Continental Group, Inc. v. Amoco Chems. Corp.,* 614 F.2d 351, 358 (3d Cir.1980).

*denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F.2d 560, 568 (5th Cir. 1981); *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185, 186 (5th Cir. 1982). Obviously, what this says is that a court should not use its extraordinary interim equity powers to bring about a public harm which would not arise if the court stayed its hand pending resolution of the merits. It does not say that the court should grant preliminary injunctive relief whenever that is sufficiently beneficial to the public. The public interest standard is a hurdle which must be overcome before employing the drastic remedy of interim injunctive relief, not a clarion call for action before reaching final judgment.[19]

The district court made no finding of irreparable harm to MP & L if the preliminary injunction were not granted, and the evidence does not demonstrate any such harm, *whether or not* all or any of the claimed excessive charges are passed through pending final judgment. The merits of this lawsuit do not involve anything other than the application of private contract law or any claim as to which anyone other than MP & L and United has a legally protectable interest. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., supra.* In these circumstances, the Court's conception of the public interest does not justify the preliminary injunction. The public interest factors are to be considered by the Mississippi Public Service Commission, in its own proceedings, to determine what, if any, interim pass through is appropriate.

Affirmance of this temporary injunction is hence contrary to our well-established requirements for such relief. I therefore respectfully dissent.

---

**19.** *See Continental Group, Inc. v. Amoco Chems. Corp.,* 614 F.2d at 358 ("In all of these cases, the effect on the public interest considered by this Court was not that justice be done, but that specific acts presumptively benefiting the public not be halted until the merits could be reached and a determination made as to what justice required."). *Cf. Restatement (Second) of Contracts* § 365 (1981) (Specific performance or an injunction will not be granted if what is required thereby is contrary to public policy.).