Phillip E. O'NEILL, et al.

v.

State of LOUISIANA, et al.

No. CIV. A. 98–2807.

United States District Court, E.D. Louisiana.

Nov. 24, 1998.

---

486

Samuel S. Dalton, Jefferson, LA, for Phillip E. O'Neill, Avery C. Alexander, Plaintiffs.

James Carl Hrdlicka, Louisiana Dept. of Justice, Baton Rouge, LA, Richard Allen Sherburne, Jr., Entergy Services, Inc., Baton Rouge, LA, for State of Louisiana, Hon. Mike J. Foster, Jr., Hon. David W. Wood, Hon. Mark C. Drennen, Defendants.

R. Gray Sexton, Baton Rouge, LA, for Louisiana State Board of Ethics, Defendant.

## ORDER AND REASONS

FALLON, District Judge.

Before the Court are three motions: 1) motion of plaintiffs Phillip E. O'Neill ("O'Neill") and Avery C. Alexander ("Alexander") for preliminary injunction; 2) motion of plaintiff Arthur A. Morrell ("Morrell") for preliminary injunction; and 3) motion of defendants State of Louisiana and Governor M.J. "Mike" Foster to dismiss plaintiffs' complaints for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Both plaintiffs' motions request that the Court enjoin implementation of the State of Louisiana's mandatory drug testing of elected officials pursuant to title 42, section 1116.1 of the Louisiana Revised Statutes. The parties have stipulated to an advancement of trial on the merits to be consolidated

with the hearing of the preliminary injunction motions.

For the following reasons, the motion of the defendants to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is hereby GRANTED IN PART and DENIED IN PART, and both plaintiffs' motions for a preliminary injunction are hereby GRANTED, and implementation of section 1116.1 is hereby PERMANENTLY ENJOINED.

## BACKGROUND

Acts 1997, No. 1303, § 1 of the Louisiana Legislature enacted title 42, section 1116.1 of the Louisiana Revised Statutes during the 1997 legislative session. Sections 2 and 3 of Acts 1997, No. 1303 provided that the State Board of Ethics ("the Board") would implement random drug testing of elected officials on January 1, 1998 or whenever funds were allocated for the design and implementation of such a program. Those funds have been allocated and a proposed screening plan is now in place, making this controversy ripe for review.

Section 1116.1 declares that "the state has a compelling interest in establishing a requirement that all elected officials demonstrate that they do not use illegal drugs, without the necessity of showing any measure of individualized suspicion." La.Rev. Stat. Ann. § 42:1116.1(A) (West Supp. 1998). The statute calls for the development and implementation of a scheme for conducting random drug testing of elected officials. See id. at § 1116.1(B). The program requires selected officials to submit to drug screening at a laboratory approved by the Board. See id. at § 1116.1(C). The Board treats test results as confidential communications available strictly for use "in a proceeding, hearing, or civil litigation for a violation of this Section." § 1116.1(D)(1).

Initial positive test results are released only to the elected official and an individual designated by the Board to receive such information, but the Board itself may obtain results should a second, confirmatory test also suggest the presence of illegal drugs. See id. at § 1116.1(D)(2). Finally, the statute forbids any elected official from either testing positive for drugs or refusing to submit to a drug screen when requested to do so. Violation of this provision results in imposition of penalties under title 42, section 1153(A) of the Louisiana Revised Statutes, but only if the official tests positive for drugs on two separate occasions or refuses to submit to screening. The regime counts a positive initial test and a confirmatory test as one occasion. See La.Rev.Stat. Ann. § 42:1116.1(E) (West Supp.1998). Penalties for violations include censure of the official or a fine of not more than ten thousand dollars, or both. See La.Rev. Stat. Ann. § 42:1153(A) (West Supp.1998).

Plaintiff O'Neill is the elected Justice of the Peace for the Second Justice of the Peace District, Jefferson Parish, Louisiana. On September 23, 1998 O'Neill filed his complaint for declaratory and injunctive relief, challenging the constitutionality of section 1116.1. His complaint requests class action certification, an injunction against implementation of drug testing, a declaration that the statute violates the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States as well as 42 U.S.C. § 1983, a declaration that the statute violates the Constitution of the State of Louisiana, and costs and attorneys' fees pursuant to 42 U.S.C. § 1988. O'Neill named as defendants the State of Louisiana, Governor M.J. "Mike" Foster, the Louisiana State Board of Ethics, and each individual member of the Board. On September 25, 1998 O'Neill amended his complaint to add Avery C. Alexander as a plaintiff. Alexander is the elected State Representative for Representative District 93, Orleans Parish, Louisiana.

The other plaintiff in this case is Arthur A. Morrell. He, like Alexander, is an elected representative to the state legisla-

ture from Orleans Parish, Louisiana. Morrell filed suit on October 1, 1998, naming Governor Foster as the sole defendant. Morrell's complaint asks this Court to declare that section 1116.1 violates the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States as well as the Constitution of the State of Louisiana, to enjoin enforcement of the statute, and to award costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

On October 8, 1998 O'Neill and Alexander filed their application for preliminary injunctive relief and for advancement of trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. They argue that the recent decision of the United States Supreme Court in *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), which declared unconstitutional a Georgia statute requiring candidates for elective office to submit to drug testing as a precondition to running for office, controls the outcome of this case. According to the plaintiffs, the only difference between Louisiana's statute and the one at issue in *Chandler* is that section 1116.1 mandates testing of officials who are already in elected office, while the Georgia statute made testing a precondition of running for elected office. The plaintiffs maintain that this distinction is meaningless for purposes of constitutional analysis. Morrell's request for a preliminary injunction, filed October 13, 1998, advances essentially the same arguments.

In the Board's opposition, the defendants assert that section 1116.1 is constitutional since the drug testing scheme it embodies is distinguishable from the program in *Chandler.* The Board acknowledges that the random urinalysis does constitute a Fourth Amendment search, so that the issue for the Court is the reasonableness of the proposed search. The Board asserts that a finding of reasonableness normally requires a showing of some individualized suspicion unless the government can demonstrate special needs beyond those of normal law enforcement. If such special needs exist, a court must balance public and private interests to determine whether the search is permissible. The Board argues that the language of the statute itself establishes the special needs for drug testing, since citizens entrust their fiscal interests to elected officials, and since these officials are charged with enacting and enforcing drug laws.

According to the Board, the balancing of interests tips in favor of drug testing. To support this assertion, the Board contends that the testing program aims to deter drug use rather than punish it, that the state has a compelling interest in the health of its elected officials, that holding elected office is a privilege as opposed to the right to run for elected office, that elected officials cede many of the rights of private citizenship and therefore possess a diminished expectation of privacy, and that testing based on individualized suspicion is not feasible in this situation.

The Board then seeks to distinguish the Georgia program struck down in *Chandler,* relying primarily on the distinction between an elected official and a candidate for elective office. The Board argues that drug use by an elected official presents a concrete danger to the public, while such use by a candidate is one step removed from such risks since the individual is not yet in office. Elected officials also take an oath to uphold and enforce the laws, while candidates have taken no such oath. Elected officials possess a lesser privacy expectation than candidates, since they are subject to more rigorous disclosure requirements concerning their private affairs. Moreover, there exists a right to run for office, but no corresponding right to retain that office once elected. Remaining in office is a privilege, not a right. Finally, the Board attests that the Louisiana scheme is more effective at deterring and discovering drug use than the Georgia program. The Board insists that the situation here is distinguishable from *Chan-*

*dler,* so that section 1116.1 passes constitutional muster.

The State's motion and brief stress arguments similar to those advanced by the Board. In pressing to uphold the statute, the State contends that special needs exist that justify the use of random drug testing. The balancing of public and private interests weighs in favor of section 1116.1 since, like the student athletes in *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), in which the Supreme Court upheld suspicionless drug testing, the elected officials here seek out the employment relationship with the State, thereby subjecting themselves to heavy regulation and a diminished expectation of privacy. Like the Board, the State emphasizes that the difference between candidates and elected officials, the increased use of drug testing in private industry, and the effectiveness of the proposed testing scheme all militate towards a finding that the public interests outweigh the private ones, making section 1116.1 reasonable under the Fourth Amendment. The State also makes some policy arguments for upholding the statute, suggesting that the very novelty of the Georgia law in *Chandler* caused the Supreme Court not to treat it and the state's interests with the serious consideration they deserved. Moreover, if legislators pass laws requiring the testing of other public employees, why should elected officials themselves be exempt from such testing? In short, the State insists that section 1116.1 is much more than a symbolic gesture aimed at discouraging drug use.

The State's motion to dismiss also argues that: 1) this Court lacks jurisdiction over the State of Louisiana since the Eleventh Amendment bars suits against unconsenting states in federal court; 2) the plaintiff O'Neill lacks standing to bring this suit, since he is a judicial official and is therefore exempt from the testing requirements of section 1116.1; and 3) the Court lacks jurisdiction as to the plaintiffs' request for a declaration that section 1116.1 violates the Constitution of the State of Louisiana.

Plaintiff Morrell responds to the defendants by insisting that the Supreme Court rejected nearly identical arguments in *Chandler.* He contends that the attempted distinction between candidates and elected officials is meaningless and was implicitly rejected by the *Chandler* Court, so that the privacy expectations of elected officials are not so diminished as to permit suspicionless drug testing. Morrell attests that the effort to distinguish elected officials from candidates is irrelevant since the defendants have failed to demonstrate any special needs for drug testing in the first place. He points out that, in other drug testing decisions, the Supreme Court recognized a diminished expectation of privacy in cases where a particular industry was heavily regulated *to ensure safety.* In other words, heavy regulation alone is not sufficient to establish a reduced level of privacy sufficient to sustain random drug testing. In the present case, Morrell contends that the *Chandler* Court specifically held that elected officials do not perform the sort of safety sensitive tasks that would support a special need for section 1116.1.

The response of O'Neill and Alexander concentrates primarily on the State's position that O'Neill lacks standing. O'Neill concedes that the statute does not apply to him in his capacity as a member of the Louisiana judiciary. O'Neill retains standing, he argues, because of his express intention to seek other elective offices in the future, thereby subjecting him to the testing regime of section 1116.1. Since the existence of the program chills his right to run for these offices, O'Neill insists that he has standing to maintain his suit.

On November 20, 1998 the parties agreed to a series of joint stipulations. The plaintiffs consented to withdrawing their request for class certification and to dismissing as defendants the members of the Board in their individual, but not official, capacities. In return, the defendants

agreed that if this Court grants the injunction, they would view such an order as binding against all defendants and would refrain from testing any elected officials. All sides agreed to an advancement of trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, so that they will regard the motions as ones for permanent rather than preliminary injunctive relief.

## ANALYSIS

### A. The State's Motion to Dismiss

As a threshold matter, the Court feels it is appropriate to address the State's Rule 12(b)(6) motion to dismiss before proceeding to review the merits of the plaintiffs' motions. When considering a motion to dismiss pursuant to Rule 12(b)(6), a court "must accept all material allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." *Garrett v. Commonwealth Mortgage Corp. of America*, 938 F.2d 591, 593 (5th Cir.1991). Dismissal is not appropriate unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hernandez v. Maxwell*, 905 F.2d 94, 96 (5th Cir.1990). In making this determination, the Fifth Circuit has stated that it is inappropriate to go beyond the face of the pleadings. *See id.*

In this case, the State contends that it is not a proper defendant because it enjoys immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States. The Supreme Court has held that, under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, the Eleventh Amendment does not bar a federal court from granting prospective injunctive relief against state officials whose enforcement of particular laws would violate the Fourteenth Amendment. *See id.* at 664

(discussing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

■ The State in its brief asserts that it has not consented to suit in federal court. The language and history of the Eleventh Amendment clearly seem to preclude the plaintiffs' maintenance of a suit against the State in this Court. This defense is one obviously available from the face of the pleadings, and no set of facts construed in the plaintiffs' favor can surmount it. Accordingly, this Court will grant the motion to dismiss the State as a defendant.

■ The Eleventh Amendment defense is not available to state officials whose enforcement of section 1116.1 would violate the Fourteenth Amendment. The Fourteenth Amendment makes the Fourth Amendment applicable to the states, so that implementation of a statute that violates the latter necessarily violates the former. Since the central allegation in this case is that section 1116.1 is unconstitutional under the Fourth Amendment, the Governor and other individuals named in their official capacities are proper defendants. To the extent that the State's motion seeks dismissal of any of these other defendants, the Court will deny its motion.

■ The State's next argument for dismissal is that plaintiff O'Neill lacks standing, since he is a judicial official who is specifically exempted from the scope of the drug testing law. The inquiry into whether a particular plaintiff has standing to contest the constitutionality of a statute hinges on that plaintiff's ability to demonstrate an injury that is fairly traceable to the challenged conduct. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Absent such a showing, a federal court lacks jurisdiction to entertain the claim. *See id.* at 37–38.

In Louisiana, all judges "shall be governed exclusively by the provisions of the Code of Judicial Conduct, which shall be administered by the Judiciary Commis-

sion." La.Rev.Stat. Ann. § 42:1167 (West 1990). Louisiana courts have determined that justices of the peace "are judges within the contemplation of the law." *Redwine v. State,* 649 So.2d 61, 63 (La.Ct.App.1994).

■ In his complaint, O'Neill describes himself as an elected justice of the peace. His conduct in office is therefore solely governed by the Code of Judicial Conduct, and the Board of Ethics, which will administer the drug tests, exercises no authority over him. O'Neill concedes this much in his response to the State's motion. Since section 1116.1 cannot apply to O'Neill, he is unable to demonstrate the requisite injury to satisfy constitutional standing requirements. He therefore lacks standing to sue, and the State's motion to dismiss will be granted as it pertains to O'Neill's claim. The Court notes, however, that the remaining plaintiffs are clearly subject to the Board's jurisdiction and possess standing to maintain their claims. To the extent that the State seeks to dismiss these plaintiffs' complaints, its motion will be denied.

The State's final basis for its motion to dismiss is that this Court lacks jurisdiction to adjudicate the question of whether section 1116.1 violates the Constitution of the State of Louisiana. Because this Court finds that the statute's violation of the Constitution of the United States disposes of the case, it will not address this last argument and will deny this part of the motion as moot.

### B. The Plaintiffs' Requests for Injunctive Relief

#### 1. Standard of Review

■ Rule 65(a) provides for the issuance of preliminary injunctions, and also permits a court to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Fed.R.Civ.P. 65(a)(2). Courts view the preliminary injunction as an extraordinary remedy, available only after the movant "by a clear showing, carries a burden of persuasion." *Black Fire Fight-*

*ers Ass'n of Dallas v. City of Dallas, Tex.,* 905 F.2d 63, 65 (5th Cir.1990). That burden of persuasion requires the movant to show the existence of four separate factors: 1) irreparable injury; 2) substantial likelihood of success on the merits; 3) a favorable balance of hardships; and 4) no adverse effect on the public interest. *See id.* If the movant fails to sufficiently establish any one of these four criteria, the preliminary injunction will not issue. *See id.* Due to the consolidation of the trial on the merits with the hearing for the preliminary injunction in this case, the foregoing calculus defines the task the plaintiffs must accomplish in order to win permanent injunctive relief.

■ It is settled, and the parties agree, that a drug test is a search within the meaning of the Fourth Amendment. *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614–16, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Since a finding that section 1116.1 violates the Fourth Amendment would constitute sufficient grounds for granting the plaintiffs' motions and enjoining the statute's enforcement, the Court will confine its inquiry to evaluating whether the Louisiana testing scheme survives Fourth Amendment scrutiny.

#### 2. Legacy of the Fourth Amendment

The actual intentions of the Framers in drafting the Fourth Amendment have provoked extensive debate throughout our history. While the Framers' precise thoughts may elude us, some scholars reviewing the history at the time of the Amendment's enactment believe that there is support for the notion that the drafters did contemplate the existence of both warrantless and nonwarrantless searches.

The Fourth Amendment has distinct historical origins and the protections it affords can be traced to events occurring immediately prior to, and during, the

American Revolution. *See* Jacob W. Landynski, Search and Seizure and the Supreme Court 19 (1966). The Fourth Amendment's drafters were aware of the famous *Wilkes* cases taking place in England during the 1760s. *See Boyd v. United States,* 116 U.S. 616, 625–27, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review,* 77 B.U.L.Rev. 925, 933–34 (1997). The cases reversed common law in holding that unauthorized intrusions on private property by officials were trespass actionable against the intruding party and the issuer of the warrant. *See Boyd,* 116 U.S. at 626, 6 S.Ct. 524; Maclin at 933–34.

Colonial citizens also protested the Excise Act of 1754, which allowed tax collectors to interrogate citizens regarding annual alcohol consumption. *See* Maclin at 943. Colonists feared that private residence searches would be the result of such broad governmental authority, and the public outcry against the issuance of these general warrants eventually led to legislation requiring specific warrants and the Warrant Clause of the Fourth Amendment. *See United States v. Chadwick,* 433 U.S. 1, 7–8, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Boyd,* 116 U.S. at 624–29, 6 S.Ct. 524; Maclin at 943–44.

Though warrantless searches and the issuance of general warrants were strongly disfavored, there is evidence that such searches were not considered absolutely prohibited at the time the Fourth Amendment was drafted. *See* Maclin at 946. The Amendment was proposed by the First Congress which also enacted the Collection Act of 1789. *See id.* at 935. The Collection Act authorized American officers to search ships without warrants, request that a judge retroactively find probable cause for a search or seizure, and otherwise immunize officers from tort lawsuits. *See id.*

In contrast to this assessment, the Fourth Amendment's jurisprudential history is rich with emphasis on the require-ment of a warrant before a search could occur. The Supreme Court has required warrants for searches and seizures conducted under governmental authority, with few exceptions. *See Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (both probable cause and a search warrant "are ordinarily required" for searches of dwellings and intrusions upon the body); *see also Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). In *Preston v. United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), the Court held that police could search a person and his immediate surroundings incident to the legal arrest of that person. In *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Court allowed police entries onto private property when in hot pursuit of a suspect. These exceptions to the warrant requirement were grounded in concerns for officer safety and the potential destruction of evidence. *See id.* at 298–99, 87 S.Ct. 1642; *Preston,* 376 U.S. at 367, 84 S.Ct. 881.

The Supreme Court employed a balancing analysis in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), to determine the reasonableness of nonconsensual housing inspections conducted without a warrant. The Court weighed the public need for housing code compliance inspections against the intrusions upon individual privacy interests. *See id.* at 534–36, 87 S.Ct. 1727. The majority found the inspections reasonable under the Fourth Amendment, but also noted that there was no urgent need for immediate access to the homes. *See id.* at 538–540, 87 S.Ct. 1727. The Court held that warrantless inspections were prohibited because the inspections were significant intrusions upon Fourth Amendment rights, and the public interest in housing code compliance would not be endangered by first requiring a warrant supported by probable cause. *See id.* at 534, 539, 87 S.Ct. 1727.

In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court held that the Border Patrol's use of checkpoint stops to detect the flow of illegal Mexican aliens was consistent with the Fourth Amendment. The Court again employed a balancing of the public and private interests at stake. *See id.* at 556–57, 96 S.Ct. 3074. Even though the stops were not based on any individualized suspicion, the Court concluded that the government's interest in controlling the influx of smugglers and illegal aliens outweighed the limited intrusion on individual citizen interests. *See id.* at 557–58, 96 S.Ct. 3074. Given the heavy volume of border traffic and the very brief opportunity for detecting aliens before they enter the country, the Court expressly declined to require reasonable suspicion as a basis for stopping cars; to do so would be impractical. *See id.* at 556–57, 96 S.Ct. 3074.

The Court also emphasized that the stops were mere visual inspections and did not involve searches of the vehicles or their occupants. *See id.* at 558, 96 S.Ct. 3074. The Fourth Amendment's objective of preventing arbitrary and oppressive invasions of personal privacy and security interests was not frustrated when governmental interests were compelling or urgent and the challenged procedure imposed only limited intrusions on the citizenry. *See Camara*, 387 U.S. at 539–40, 87 S.Ct. 1727; *see also Martinez–Fuerte*, 428 U.S. at 554–57, 96 S.Ct. 3074.

The Supreme Court held in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), that the search of a student's purse by a school official did not violate the Fourth Amendment. The majority explained that the school had a legitimate interest in maintaining order and a warrant requirement would be impractical when swift and effective discipline was necessary. *See id.* at 339–40, 105 S.Ct. 733. In his concurring opinion, Justice Blackmun wrote that in "exceptional circumstances," when the government has demonstrated the existence of "special needs, beyond the normal need for law enforcement," a court could resort to the balancing of government and individual citizen interests. *Id.* at 351, 105 S.Ct. 733.

### 3. Overview of Drug Testing

In recent years, when evaluating the constitutionality of suspicionless drug tests, the Court has continued to require the existence of "special needs" *before* applying the balancing test. The Court's struggle to give some tangibility or concreteness to this concept is perhaps nowhere more evident than in cases involving Fourth Amendment challenges to drug testing laws. *See Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). These decisions have erected the guideposts this Court must follow.

The clash between drug testing and the Fourth Amendment is a recent phenomenon, with its genesis in the rise of drug abuse in this country during recent decades. The scourge of drug abuse naturally provoked attempts to control the problem. State and federal governments devised an array of weapons to combat what some had characterized as a threat to this country's security and prosperity. Programs including more aggressive law enforcement, interdiction, prevention, treatment, and education all emerged as tools in the arsenal. One of these approaches involved urinalysis of particular employees to ensure that they were not abusing drugs.

The Supreme Court has attempted to reconcile the need for such programs with the basic constitutional freedoms cherished by this nation. Review of a few key decisions is sufficient to canvass the terrain of

the debate surrounding drug testing and privacy.

The Supreme Court's first significant treatment of the issue occurred in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In that case, the Court examined whether Federal Railroad Administration regulations mandating blood and urine tests of employees involved in accidents, and authorizing them for those who violated certain safety rules, passed constitutional muster. *See id.* at 606, 109 S.Ct. 1402. After determining that the collection and analysis of urine samples implicated reasonable societal expectations of privacy and amounted to a search, *see id.* at 617–18, 109 S.Ct. 1402, the majority emphasized that the Fourth Amendment only prohibited unreasonable searches and seizures, *see id.* at 619, 109 S.Ct. 1402.

The hallmark of a reasonable search was one accomplished pursuant to a warrant based on probable cause and individualized suspicion, but the Court recognized that certain exceptions to this rule had evolved, particularly when the warrant and probable cause requirements were impracticable due to "special needs" beyond the normal need for law enforcement. *See id.* In cases where special needs justified a warrantless search, the inquiry hinged on the definition of reasonableness, which " 'is judged by balancing [the] intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests.' " *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). By conducting this balancing test, the Court sought to lend some tangibility to the concept of reasonableness and thereby to predict when a warrantless search would measure up to constitutional standards.

After recognizing that urine testing implicated reasonable expectations of privacy, the focus shifted to whether the government possessed a special need to conduct the screens. In *Skinner*, the Court held that, in certain circumstances,

where the intrusion was minimal and the important interest advanced by the government might be jeopardized by a requirement of individualized suspicion, a search might be reasonable even without individualized suspicion. *See id.* at 624, 109 S.Ct. 1402. With these principles in mind, the Court reviewed the testing scheme and the privacy interests at stake in the case.

The Court determined that there existed a history of alcohol and drug abuse among railway employees, *id.* at 606–08, 109 S.Ct. 1402, giving rise to a legitimate government interest in preventing accidents caused by employees' use of such substances, *id.* at 620–21, 109 S.Ct. 1402. The Court found that these factors, coupled with the pervasive regulation that is characteristic of the railroad industry, *see id.* at 627, 109 S.Ct. 1402, led to the conclusion that the government's compelling interest in safety and the individual's diminished expectation of privacy in the railroad context permitted urine testing, even without any showing of individualized suspicion, *see id.* at 633, 109 S.Ct. 1402.

The Supreme Court confronted these issues again in *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). In that case, an Oregon student and his parents challenged a local school district's policy of requiring student athletes to undergo random urinalysis for the detection of drugs as a condition of participation in school athletic programs. *See id.* at 651, 115 S.Ct. 2386. The Court reiterated that such testing implicated the Fourth Amendment and · applied the same test to assess the program's reasonableness. *See id.* at 652–53, 115 S.Ct. 2386. In making the · determination of whether a special need existed to suspend the normal individualized suspicion requirement in the context of a school drug screening program, the Court debated many of the same arguments it considered in *Skinner*.

The majority concurred in the district court's assessment that drugs were a significant presence at the school in *Vernonia*, and that athletes' use of drugs and their status as role models for other students exacerbated this problem. *See id.* at 662–63, 115 S.Ct. 2386. The Court located a safety issue in the concern for the welfare of children, who might be particularly susceptible to physical, emotional, and social damage from drug abuse. *See id.* at 661–62, 115 S.Ct. 2386. Like the railway employees in *Skinner,* the students in *Vernonia* possessed a diminished expectation of privacy, due primarily to the in loco parentis role played by school officials. *See id.* at 655, 115 S.Ct. 2386. Indeed, " 'students within the school environment have a lesser expectation of privacy than members of the population generally,' " and "[l]egitimate privacy expectations are even less with regard to student athletes." *Id.* at 657, 115 S.Ct. 2386. In view of these factors, the majority concluded that the school district's policy was constitutional, but cautioned "against the assumption that suspicionless drug testing will readily pass constitutional muster in other contexts." *Id.* at 664–65, 115 S.Ct. 2386.

*Skinner* and *Vernonia* revealed some common considerations the Court found persuasive in deciding whether to uphold a particular drug testing scheme. In both cases, it seemed that the majority opinions identified a history of drug abuse, a fairly immediate safety concern, and a diminished expectation of privacy as justifications for bestowing the Court's constitutional blessing on the programs at issue.

One of these considerations was absent in a related case decided the same day as *Skinner.* In *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the majority upheld a United States Customs

Service drug testing plan that called for urine sampling of employees who applied for promotion to positions that involved interdiction of illegal drugs and required those hired to carry firearms or handle classified material. *See id.* at 679, 109 S.Ct. 1384. The Court in *Von Raab* found that agents with a drug problem who occupied positions involving the use of weapons or handling of drugs posed a significant safety threat. *See id.* at 668–71, 109 S.Ct. 1384. This meant that those employees enjoyed a diminished expectation of privacy, thereby justifying the use of drug tests. *See id.* at 672, 109 S.Ct. 1384. Notably absent from the calculus in that case was any preexisting history of drug abuse on the part of the Customs agents. Indeed, the majority noted a statement by the Commissioner of Customs that, in his opinion, " 'Customs is largely drug-free.' " *Id.* at 660, 109 S.Ct. 1384. Nevertheless, this agency was tasked with a unique mission since it served as the "first line of defense" against the smuggling of drugs into the United States. The Court in *Von Raab* concluded that the government had a compelling interest in assuring that employees placed in these positions would not include drug users.

*Von Raab* found that special needs existed and that the government interest was sufficiently compelling to justify suspicionless testing of the category of Customs employees at issue. *See id.* at 679, 109 S.Ct. 1384.[1]

In *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), candidates for elective office challenged a Georgia statute that required them to submit to and pass a drug test in order to qualify for state office. The Supreme Court found the law unconstitutional as violative of the Fourth Amendment. *See id.* at

1. Some commentators have pointed to the absence of any history of drug abuse in *Von Raab* as creating a potential slippery slope which the Court later recognized, prompting it to endorse a more restrictive view of suspicionless searches in *Chandler v. Miller. See*

George M. Dery III, *Are Politicians More Deserving of Privacy Than Schoolchildren? How* Chandler v. Miller *Exposed the Absurdities of Fourth Amendment "Special Needs" Balancing,* 40 Ariz. L.Rev. 73, 91–94 (1998).

1305. The Court reiterated its earlier position that collection and testing of urine samples by the government qualified as a Fourth Amendment search. *See id.* at 1300. Whether the searches at issue in *Chandler* were reasonable depended on the existence of some measure of individualized suspicion, unless the state could show some special needs, beyond the normal need for law enforcement, that justified a particularized exception to this rule. *See id.* at 1301. Determining whether such special needs existed forced the majority to "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* In the context of drug testing, Justice Ginsburg noted the Court's precedents establishing that "the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 1303.

In applying this analysis to the statute in *Chandler*, Justice Ginsburg observed that the state's defense of the program relied heavily on the notion that holding high office and using drugs were incompatible. *See id.* Unlike the Court's previous drug cases, however, there did not exist "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." *Id.* Indeed, the majority found nothing in the record before it suggesting that "the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity." *Id.* While not dispositive, the Court also found it relevant that the state had not presented any evidence of a drug problem among candidates for elected office. *See id.* at 1303–04.

In summarizing its findings, the majority stated that "Georgia asserts no evidence of a drug problem among the State's elected officials, those officials typically do not perform high-risk, safety-sensitive tasks,

and the required certification immediately aids no interdiction effort." *Id.* at 1305. Essentially, of the three primary factors the Court had looked for in its earlier decisions—history of drug abuse, immediate safety concerns, and diminished expectation of privacy—only the last was arguably present in *Chandler*. The Court held that this was not enough, since the "need revealed, in short, is symbolic, not 'special.' " *Id.* In contrasting *Chandler* with its earlier rulings, the majority cautioned that "if a need of the 'set a good example' genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in *Skinner, Von Raab,* and *Vernonia* ranked as 'special' wasted many words in entirely unnecessary, perhaps even misleading, elaborations." *Id.* Justice Ginsburg made it clear that, "[h]owever well-meant, the candidate drug test ... diminishes personal privacy for a symbol's sake." *Id.* The Court concluded that the Georgia statute was unconstitutional, because where "public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." *Id.*

■ The *Chandler* opinion exhibits an apparent retrenchment in the Court's drug testing jurisprudence. While continuing to recognize that suspicionless searches are occasionally justified, Justice Ginsburg stressed that in cases where the requisite showing of a special need is lacking, there is no need to balance public and private interests because the Fourth Amendment bars such searches. In other words, the inquiry as it has matured from *Skinner* to *Chandler* is a two step process. First, a court must determine whether special needs exist that justify a suspicionless search. If, and only if, such special needs are present, a court may then proceed to the second phase, balancing public versus private interests. In *Chandler*, the Supreme Court never reached the second step because it found no special needs. This view appears consistent with the one

held by the drafters of the Amendment, who apparently envisioned the possibility of warrantless searches so long as they were accompanied by some level of suspicion or exigent circumstance (i.e., "special needs").

### 4. Constitutionality of the Louisiana Statute

Having reviewed the jurisprudence applicable to drug testing, this Court will now turn its attention to the statute challenged in this case. Section 1116.1 clearly states its intention to authorize drug testing "without the necessity of showing any measure of individualized suspicion." This proclamation means that, in order to survive Fourth Amendment scrutiny, the statute must meet the special needs test enumerated by the Supreme Court.

The defendants place great emphasis on the distinction between elected officials and candidates in their attempt to distinguish this dispute from *Chandler*. The tone of the majority opinion in that case, however, indicates that the *Chandler* Court saw little difference between the two groups. The majority explicitly referred to elected officials rather than candidates when it found that the statute's target group performed no safety sensitive tasks establishing the requisite special needs. Moreover, it is clear from the *Chandler* opinion that the only reason Georgia was interested in testing candidates was due to the prospect that they might later become elected officials. Absent this possibility, there was absolutely no reason to pass such a statute in the first instance. Furthermore, if it is improper to drug test a candidate for elected office, it seems incongruous to hold that once an individual is actually in office that person is somehow more susceptible to the very same search.

Because this Court finds no meaningful distinction between candidates for public office and those who have ascended to such office following an election, the principles of *Chandler* squarely control the outcome of this case.

There is no question that the proposed tests under section 1116.1 constitute searches within the meaning of the Fourth Amendment. This ordinarily triggers a requirement that the government display some measure of individualized suspicion in order to justify the search. Since the Louisiana statute clearly states its intention to conduct suspicionless searches, the burden falls on the defendants to demonstrate that there exist some "special needs," beyond the normal needs of law enforcement, that support a particularized exception to the main rule.

In the present case, the defendants acknowledge the absence of any history or pattern of drug abuse among elected officials. No evidence has been presented to suggest that such a problem exists. While the defendants assert, and it is true, that the lack of an existing pattern of abuse is not by itself sufficient to strike down a drug testing statute, other considerations in conjunction with this one are fatal to section 1116.1.

As for any immediate safety threat to the public, the defendants advance essentially the same generalized arguments rejected by the majority in *Chandler*. To paraphrase Justice Ginsburg, nothing in the record before this Court hints that the hazards the defendants broadly describe are real and not simply hypothetical to Louisiana's polity. Moreover, the *Chandler* Court specifically found that elected officials do not occupy safety sensitive positions within the meaning of its drug testing jurisprudence.

What is left, then, is the diminished expectation of privacy characteristic of all public officials. This factor is certainly present, but it was also present in *Chandler* and failed to sway the majority. Notwithstanding the defendants' arguments to the contrary, then, the purpose of section 1116.1 is largely symbolic. Despite the laudable intentions of the legislature in trying to present an example for the public, the Supreme Court has stated unequiv-

ocally that symbolism alone is insufficient to justify suspicionless searches in violation of the Fourth Amendment.

In summary, this Court concludes that the defendants have failed to carry their burden in demonstrating that "special needs" beyond the normal needs of law enforcement exist, such that an exception to the rule requiring individualized suspicion is warranted. For this reason, Louisiana's proposed scheme of random, suspicionless drug testing under section 1116.1 is an unconstitutional search in violation of the Fourth Amendment.

Having analyzed section 1116.1 under the Fourth Amendment, the Court must now factor its conclusion into the calculus for determining whether to grant the preliminary injunctions sought by the plaintiffs in this case. As stated at the outset of this Order, whether to grant a preliminary injunction depends on the movant showing the presence of each of four separate criteria: 1) irreparable injury; 2) substantial likelihood of success on the merits; 3) a favorable balance of hardships; and 4) no adverse effect on the public interest.

The Fourth Amendment discussion detailed above indicates that the plaintiffs satisfy the second requirement. Since a finding of unconstitutionality ensures that the plaintiffs would prevail on the merits, the Court need not address the other proffered grounds for striking down the statute. The Court finds that the plaintiffs fulfill the irreparable injury requirement since money damages would not be adequate to redress the constitutional harms implementation of the drug testing program would cause. The balance of hardships also weighs in favor of granting the requested relief. The impermissible invasion of privacy occasioned by section 1116.1 is far graver than any inconvenience the defendants may experience as a result of an injunction against the statute's enforcement. Finally, while there is certainly an argument that the public has an interest in seeing Louisiana's drug testing scheme implemented, this general interest falls short of the plaintiffs' countervailing one in preserving the basic protections afforded by the Fourth Amendment. Since no "special needs" beyond the normal needs of law enforcement exist to justify suspicionless searches in this situation, the public's interest in preventing drug abuse among elected officials, while not insignificant, cannot supersede one of the Constitution's most fundamental proscriptions.

The plaintiffs have demonstrated that they meet each of the four requirements for the issuance of a preliminary injunction. In light of the parties' stipulations in this matter, the Court will grant the plaintiffs' motions and permanently enjoin enforcement of section 1116.1.

### CONCLUSION

For the foregoing reasons, IT IS ORDERED that the motion of defendants State of Louisiana and Governor M.J. "Mike" Foster to dismiss the plaintiffs' motions pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is hereby GRANTED IN PART, such that the State of Louisiana is dismissed as a defendant due to its Eleventh Amendment immunity and the complaint of plaintiff Phillip E. O'Neill is dismissed for lack of standing, and DENIED IN PART, as it relates to all other parties and claims. The motion of plaintiff Avery C. Alexander and the motion of plaintiff Arthur A. Morrell for preliminary injunction against the enforcement of title 42, section 1116.1 of the Louisiana Revised Statutes are hereby GRANTED, and the defendants are hereby PERMANENTLY ENJOINED from implementing or enforcing the statute since it violates the Fourth Amendment to the Constitution of the United States.