Joseph **CHAMBERS**

v.

**COVENTRY HEALTH CARE OF LOUISIANA, INC.**

Civ.A. No. 04–1086.

United States District Court,
E.D. Louisiana.

May 10, 2004.

Stephen M. Pizzo, Kurt Stephen Blankenship, Guice Anthony Giambrone, III, Blue Williams, L.L.P., Metairie, LA, for Plaintiff.

Dan Richard Dorsey, Porteous, Hainkel, Johnson, LLP, Covington, LA, for Defendant.

## ORDER & REASONS

FALLON, District Judge.

### I. BACKGROUND

Plaintiff Joseph Chambers, a sixty-two-year-old resident of Jefferson Parish, has been diagnosed with colon cancer. Mr. Chambers underwent surgery on May 28, 2003 to treat the cancer, but that surgery was not successful. Subsequent tests revealed that the colon cancer had metastasized to his liver, and the Plaintiff underwent a second surgery in August 2003.

Following his liver surgery, the Plaintiff began a course of chemotherapy and was treated by Dr. William Stein. On March 5, 2004, Dr. Stein requested authorization from Defendant Coventry Health Care of Louisiana, the Plaintiff's health insurance provider, to perform a PET fusion scan. The request was denied. On March 30, 2004, Dr. Stein again requested authorization from the Defendant to perform the PET fusion scan, and the Defendant again denied the request. The Defendant explained that it denied the requests because it had concluded that the PET fusion scan was experimental and investigational, and under the terms of the Plaintiff's health insurance policy experimental and investigational procedures are excluded.

On April 2, 2004, the Plaintiff brought suit against Defendant Coventry Health Care of Louisiana in the First Parish Court for the Parish of Jefferson, State of Louisiana, seeking a temporary restraining order, preliminary injunction, and permanent injunction. Specifically, the Plaintiff sought to prohibit the Defendant from enforcing its decision to characterize PET fusion scans as experimental and/or investigational treatment under the health plan purchased by the Plaintiff.

On April 16, 2004, the Defendant removed the matter to the Eastern District of Louisiana pursuant to 28 U.S.C. § 1441,

invoking this Court's federal question jurisdiction. Because the dispute arises from the Employee Retirement Income Security Act of 1974 (ERISA), the matter is properly before the Court.

On April 23, 2004, the Court held a hearing on the Plaintiff's request for a temporary restraining order. The Court denied the Plaintiff's request for a temporary restraining order and set a hearing on the Plaintiff's demand for a preliminary injunction for Monday, May 3, 2004. On May 3, 2004, counsel appeared and called witnesses in support and in opposition to the request for a preliminary injunction. The Court is now ready to rule.

## A. PET Fusion Scans

A PET fusion scan is a diagnostic tool that combines in-line PET and CT cameras to locate and evaluate certain types of cancer with great accuracy. The Plaintiff contends that unlike traditional PET scans, the PET fusion scan affords a significant increase in the ability to detect and precisely locate a lesion and to characterize it in order to properly evaluate the presence and stage of colorectal cancer.

The Plaintiff submitted expert testimony and background materials regarding the use of PET fusion scans in the treatment and diagnosis of certain types of cancer. These materials indicated that computer tomography (CT) has been the main diagnostic tool in the treatment of cancer because of the ability of CT to depict abnormal anatomy and abnormal contrast enhancement due to pathological changes. CT scans, however, are not without limitations. CT scans are limited in their depiction of pathological changes in normal-sized structures, such as lymph nodes and of lesions that lack good contrast with surrounding tissues.

Positron emission tomography (PET) scans provide information on glucose uptake and metabolism and this information facilitates the detection of primary tumors, metastases, and early tumor recurrence. PET scans, however, also have limitations. Unlike CT scans, PET scans do not provide physicians with anatomic landmarks, impeding the localization of lesions in patients. PET fusion scans combine the benefits of CT and PET scans and result in more accurate tumor localization.

The separate utility of CT and PET scans in the diagnosis and treatment of various types of cancer is not disputed by the parties. Moreover neither scan is considered experimental. Both scans have become common tools employed by oncologists and are each covered under the defendant's policy. There is a dispute, however, between the parties as to whether the PET fusion scan is a reliable and established diagnostic tool or an experimental and investigational treatment that is excluded from coverage by the Plaintiff's insurance policy. The Defendant claims the PET fusion scan is experimental and the Plaintiff argues that it is not. Interestingly enough, the cost is the same. The PET fusion scan at issue costs $2,700. The CT and PET scans cost a total of $2,700. So the issue is not cost but status.

At the May 3, 2004, hearing, each party called witnesses on its behalf. The Plaintiff offered the expert testimony of two oncologists. Dr. William Stein, Chambers' treating physician and a medical oncologist, and Dr. Michael Hayman, Dr. Stein's partner and a certified radiation oncologist. Both offered expert testimony that the PET fusion scan is widely accepted in the scientific community and in the relevant medical literature. Dr. Stein and Dr. Hayman testified that all of the main national cancer centers possessed equipment used to conduct PET fusion scans, and that the PET fusion scan has clearly demonstrated advantages as a diagnostic modality in the treatment of colorectal cancer.

Furthermore, they stated that the Defendant entered into a contract with the PET Fusion Center LLC to cover PET scans and set a specific sum that they would allow, which was $2,700. They also testified that Coventry has approved and paid for PET fusion scans in the past. The Defendant claims that it had mistakenly entered into a contract with PET Fusion Center, LLC, and that the prior payments were approved because of erroneous coding. With regard to Mr. Chambers, Dr. Stein testified that the PET fusion scan is necessary to determine whether Chambers' cancer had recurred, and if so, whether he needs another operation, a course of chemotherapy, or some other mode of treatment.

The Defendant offered the testimony of Dr. Bernard Mansheim, who is board certified in internal medicine. Dr. Mansheim does not practice medicine, but works as the Chief Medical Officer and Senior Vice President of Coventry Health Care. Dr. Mansheim testified that one of his duties as the Defendant's Chief Medical Officer is to determine whether a procedure, technology, or medicine is experimental or investigatory. Dr. Mansheim testified that he makes this determination by collecting all published articles on a subject and personally reading them. Based on his interpretation of these published studies, Dr. Mansheim testified that he decides whether an emerging technology has been embraced by the consensus of medical professionals or whether the technology is still experimental or investigatory. He utilized this procedure in evaluating the status of PET fusion scans and concluded that the use of PET fusion scans is experimental and excluded under the terms of the Group Membership Agreement.

### B. Joseph Chambers' Insurance Policy

Defendant Coventry Health Care of Louisiana, Inc., a Louisiana Health Maintenance Organization, provides an ERISA Benefit Plan for employees of Roberson Advertising Services, Inc., including Plaintiff Joseph Chambers. Both parties agree that ERISA governs the interpretation of the Group Membership Agreement.

The exclusions and limitations of the Group Membership Agreement, pursuant to which Mr. Chambers is insured, exclude medical services that are not medically necessary. "Medically necessary" is defined by the policy to be: those Covered Services determined by [Coventry] to be:

1. Medically appropriate so that expected health services (such as, but not limited to, increased life expectancy, improved functional capacity, prevention of complications, relief of pain) materially exceed the expected health risks;

2. Necessary to meet the health needs of the Member, improve physiological function and required for a reason other than improving appearance;

3. Rendered in the most cost-efficient manner and setting appropriate for the delivery of health service;

4. Consistent in type, frequency and duration of treatment with scientifically based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are generally accepted as national authorities on the services, supplies, equipment or facilities for which coverage is requested;

5. Consistent with the diagnosis of the condition at issue;

6. Acquired for reasons other than the comfort or convenience of the Member or his or her Physician; and

7. *Not experimental or investigational as determined by US.* (emphasis added)

A health product or service is deemed experimental or investigational and excluded from coverage under this Agreement, if one or more of the following conditions are met:

(I) Any drug not approved for use by the FDA;

(ii) Any drug that is classified as IND (investigational new drug) by the FDA;

(iii) Any drug requiring pre-authorization that is proposed for off-label prescribing;

(iv) Any health product or service that is subject to Investigational Review Board (IRB) review or approval;

(v) Any health product or service that is the subject of a clinical trial that meets criteria for Phase I, II or III as set forth by FDA regulations; or

(vi) Any health product or service that does not have a demonstrated value based on clinical evidence reported by peer-review medical literature and by generally recognized academic experts.

## II. LAW & ANALYSIS

■ It is established law that courts may issue injunctions to compel the payment of health benefits under an ERISA plan. *See, e.g., Wilson v. Group Hospitalization and Med. Servs.*, 791 F.Supp. 309 (D.D.C.1992). Rule 65(a) of the Federal Rules of Civil Procedure authorizes the district courts to issue a preliminary injunction in order to protect a plaintiff from irreparable injury and to preserve judicial power to render a decision after trial on the merits. *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974) "The grant or denial of a preliminary injunction rests in the discretion of the district court." *Id.* Although the federal rules authorize the use of a preliminary injunction, it remains an "extraordinary remedy," and a court's decision to grant preliminary injunctive relief is "the exception rather than the rule." *Karaha Bodas Co. v. Negara,*

335 F.3d 357, 363—64 (5th Cir.2003) (quoting *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985)).

■ The party seeking a preliminary injunction must "clearly carr[y] the burden of persuasion" on each of four elements: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. GMC*, 328 F.3d 192, 195 (5th Cir.2003) (quoting *Mississippi Power & Light Co.*, 760 F.2d at 621).

If a movant fails clearly to carry its burden with respect to any one of these four criteria, then the preliminary injunction shall be denied. *See Black Fire Fighters Ass'n v. City of Dallas, Tex.*, 905 F.2d 63, 65 (5th Cir.1990); *O'Neill v. Louisiana*, 61 F.Supp.2d 485, 491 (E.D.La.1998), *aff'd by,* 197 F.3d 1169 (5th Cir.1999). The Court shall address each element in turn.

### A. Substantial Threat of Irreparable Injury

■■ To receive preliminary injunctive relief, an applicant must show by credible evidence that the failure to issue injunctive relief poses an actual threat of an injury that cannot be adequately compensated through the normal litigation process. Mr. Chambers claims that he has suffered and continues to suffer irreparable injury from Coventry's refusal to authorize the PET fusion scan. He has colorectal cancer that has metastasized to his liver. Two operations and courses of chemotherapy have not eliminated it. The cancer is now in remission, but there is a strong likelihood that it will recur. The question is where

and when. His treating oncologist testified that a PET fusion scan is needed to detect the presence and precise location of a recurring lesion. Early detection and precise location will determine the nature and extent of treatment and increase Chambers' chances of survival. Late detection could be fatal or result in the need for extended chemotherapy, a kind of living death. Either alternative is irreparable.

The Court is mindful that established law discourages granting an injunction where monetary damages can compensate for the loss. But time is an important factor here, and the pursuit of monetary damages may only be available to Chambers' heirs. Clearly such a Pyrrhic result should not destroy the irreparable quality of this issue.

The cost is only $2,700 but to someone with limited or no assets the cost is insurmountable. The Plaintiff in his initial petition alleges he cannot afford the procedure, not surprising for someone who has undergone such past extensive treatment. In any event, the Plaintiff's allegation of his impecuniousness has not been rebutted.

### B. Balance of Potential Harms

■ The potential harm to the Plaintiff from not granting the preliminary injunction clearly outweighs any harm to the Defendant from issuing the injunction. The Plaintiff, an individual, suffers from colorectal cancer that has metastasized to his liver. The Defendant is a division of a national HMO with more than 600,000 members. The injury that could result from the Plaintiff's failure to obtain a PET fusion scan, namely the failure to diagnose or isolate recurring cancer lesions, outweighs the possible $2,700 harm to the Defendant. Moreover, if the Plaintiff instead undergoes a PET scan and a CT scan, both of which are covered, the Defendant will incur the same costs.

### C. The Public's Interest

■ There is no suggestion that the grant of this preliminary injunction would harm the public in any way. The dispute arises between an individual Plaintiff and a corporate Defendant. The Plaintiff seeks an injunction that relates only to the provision of one particular type of diagnostic test, and the Court's ruling will only affect those individuals who are covered by the Defendant's health insurance policies.

### D. Likelihood of Success on the Merits

■ Finally, an applicant must demonstrate a substantial likelihood that he will be successful on the merits in order to obtain preliminary injunctive relief. In the context of a request for a preliminary injunction the plaintiff need not demonstrate an absolute certainty of success on the merits. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C.Cir.1977). It is enough that the Plaintiff raises legal questions that are sufficiently serious and substantial that a more thorough investigation is appropriate. Both parties concede that the matter is governed by ERISA, and the Plaintiff does not challenge Defendant Coventry's assertion that the Defendant is the designee of the ERISA plan administrator. ERISA provides jurisdiction to review determinations made pursuant to benefit plans. 29 U.S.C. § 1132(a)(1)(B) (2000).

■ Under ERISA an employer both administers benefits plan and also adjudicates health insurance claims for coverage under the applicable policy. *Wilson,* 791 F.Supp. at 312. Often the employer delegates the responsibility for adjudication of claims to the insurance car-

rier. When an employer delegates responsibility for the adjudication of claims to an insurance carrier, the carrier assumes a fiduciary relationship with a covered employee; and this fiduciary relationship creates a conflict of interest with the insurer's profit making goals. *Id.*

 Any challenge to the denial of benefits under ERISA is to be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan provides the administrator with discretionary authority to determine eligibility or to construe the terms of the plan, decisions are reviewed for abuse of discretion. *Id.* If the discretion lies with an administrator operating under a conflict of interest, then "that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Id.*

 The Fifth Circuit clarified the appropriate standard of review of benefit determinations made by a self-interested administrator with discretionary authority. "The existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim. The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion will be." *Vega v. Nat'l Life Ins. Servs.,* 188 F.3d 287, 295 (5th Cir.1999) (en banc). In such situations, a district court applies a "sliding scale" to the abuse of discretion standard, and the court is less likely to give the administrator the benefit of the doubt when faced with a record that is arguably in conflict with the administrator's decision. *Id.* at 297, 299.

Here, Defendant Coventry retained discretionary authority to construe the terms of the plan. Notably, the Group Membership Agreement authorizes Coventry to determine whether a particular type of medical procedure is "experimental or investigatory" and thus excluded from coverage. Because the Defendant acts as a claims adjudicator, it stands in the employer's role as a fiduciary and determines what procedures are covered. It also pays the cost of the medical procedure, presenting an inherent conflict of interest. With this in mind the Court considers the Defendant's position.

In this case the Defendant, Coventry, concluded that the prescribed PET fusion scan was excluded from coverage because it was experimental. Dr. Mansheim, Coventry's Chief Medical Officer, made the decision. At the hearing he explained the methodology he used in arriving at his conclusion. Dr. Mansheim explained that in accordance with standard procedure he instructed his nurses to assemble all of the medical articles discussing PET fusion scans and he reviewed them.

Dr. Mansheim concluded that the requested PET fusion scan was experimental based solely on his reading and interpretation of the medical literature. That determination excluded the PET fusion scan from coverage under the policy. At the hearing Dr. Mansheim cited five articles in support of his conclusion, pointing to various words and sentences in these articles. Dr. Mansheim is a board certified internist, but he has not practiced medicine in fourteen years and has no specialized knowledge, training, or experience in oncology.

At the hearing the Drs. Stein and Hayman testified that Dr. Mansheim misread or misinterpreted the articles. These doctors are board certified and practicing oncologists. They claimed that their reading of the same oncological articles supported their view that PET fusion scans were widely used and not experimental.

Clearly, the Group Membership Agreement at issue allows Coventry to make the decision as to what is experimental. But their decision must be based on appropriate and sound methodology and here it was not. The Defendant's methodology would never satisfy the requirements of medical science and it does not meet the standards imposed by the applicable law.

Furthermore, Coventry's methodology strays from the very terms of the Group Membership Agreement. Dr. Mansheim testified that he determines whether a new technology or procedure is experimental by asking whether the procedure has been adopted as the "standard of care" and has been embraced by the consensus of medical professionals. If a technology has not been accepted as the standard of care, then Dr. Mansheim testified that it is experimental and not covered by Coventry.

Although Dr. Mansheim's procedure may reveal whether a technology is "experimental" in a colloquial sense of the term, it is not the test specified in the Group Membership Agreement. In relevant part, the Agreement defines "experimental or investigational procedures" as those services that do not have "a demonstrated value based on clinical evidence reported by peer-review medical literature or by generally recognized academic experts." (Group Membership Agreement § 5.15.) Even assuming that PET fusion scans are not yet the "standard of care" in medical community, that does not mean they are experimental under the terms of the policy. Dr. Mansheim testified that the PET fusion scan has yet to be embraced by a consensus of medical professionals, but he did not rebut the Plaintiff's oncological experts' testimony that PET fusion scans have demonstrated value that is documented in both peer-review literature and by practitioners at the nation's leading cancer research institutes. The plain terms of the contract weigh against the Defendant's methodology and indicate that Coventry may have abused its discretion in finding the PET fusion scan to be an "experimental procedure."

Moreover, the undisputed testimony reveals that the PET fusion is not an entirely new test. It appears to be a consolidated test that fuses two technologies that are each covered by the Defendant's Group Health Agreement. Undisputed testimony also reveals that the PET fusion scan is employed by all of the nation's major cancer institutes. The cost of the PET fusion scan is the same as the cost of the two covered tests. To deny the PET fusion scan and approve the individual component scans appears illogical, at least at first blush.

But the Court need not decide whether or not PET fusion scans are or are not experimental under the terms of the Group Health Agreement. That decision must await a trial on the merits. What is clear at the present time, however, is that the evidence produced by the Plaintiff is sufficient to raise legal questions that are sufficiently serious and substantial that a more thorough investigation is appropriate. This satisfies the likelihood of success required by Rule 65(a).

In summary, therefore, this Court finds that the Plaintiff has carried the burden of persuasion that there is a substantial likelihood that he will prevail on the merits, that there is a substantial threat that he will suffer irreparable injury if the injunction is not granted, that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin and the granting of the preliminary injunction will not disserve the public interest. For there reasons this Court grants the Plaintiff's motion for a preliminary injunction. An order consistent with this opinion is issued contemporaneously herewith.

### ORDER

Upon consideration of the motion for a preliminary injunction, the opposition thereto, the hearing held on May 3, 2004 and the entire record herein, and in accordance with the opinion issued herewith, it is hereby

ORDERED that the Plaintiff's motion for a preliminary injunction is granted; and it is further

ORDERED that Defendant is enjoined from notifying PET Fusion Center, LLC that Plaintiff is not insured for a PET fusion scan; and it is further

ORDERED that Defendant is enjoined from denying coverage for one PET fusion scan for the Plaintiff and shall pay PET Fusion Center, LLC for the cost of one PET fusion scan of the Plaintiff, Joseph Chambers; and it is furthered

ORDERED that the Plaintiff shall post a bond of $500 forthwith; and it is further

ORDERED that this Order shall be valid until final disposition of this case on the merits.